IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA MCCORMICK, | ) | CASE NO. 5:20-cv-2510 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE PAMELA BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Christina McCormick ("Plaintiff" or "Ms. McCormick") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should ensure that his analysis regarding Ms. McCormick's schizoaffective disorder, cognitive impairments, and activities of daily living accurately describe the underlying evidence and clearly set forth the ALJ's reasoning in making each of the determinations required under Steps Two, Three, and Four of the sequential analysis.

1

## I.  Procedural History

There is a prior finding of disability in this case.  In October 2006, Ms. McCormick was found disabled as of June 2004.  (Tr. 65.)  In July 2016, the agency determined that Ms. McCormick's disability ended on September 30, 2015.  (Tr. 65.)  The agency's decision was upheld upon reconsideration, and Ms. McCormick requested a hearing, which was held in January 2018.  (*Id*.)  On March 19, 2018, an ALJ upheld the state agency finding that Ms. McCormick's disability ended on September 30, 2015.  (Tr. 72.)

On April 11, 2018, Ms. McCormick filed a new application for SSI.  (Tr. 187-189.)  She alleged a disability onset date of April 2, 2016.  (*Id*.)  She alleged disability due to ADHD, processing disorder, seizures, cognitive disorder, auditory disorder, and high blood pressure.  (Tr. 209.)  Ms. McCormick's application was denied at the initial level (Tr. 94) and upon reconsideration (Tr. 115), and he requested a hearing (Tr. ).  On November 19, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 32-61.)

On December 5, 2019, the ALJ issued a decision finding that Ms. McCormick had not been under a disability within the meaning of the Social Security Act from April 2, 2016 through the date of the decision.  (Tr. 12-31.)  On September 9, 2020, the Appeals Council denied Ms. McCormick's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On November 6, 2020, Ms. McCormick filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case. (ECF Docs. 15, 17, 19.)

## II. Evidence

**A.     Legal and Factual Findings in Prior ALJ Decision**

On March 19, 2018, a prior ALJ decision established that Ms. McCormick was not disabled as of September 30, 2015, after previously having been found disabled as of June 9, 2004.  (Tr. 65-72.)  At the time of the comparison point decision on October 25, 2006, the 2018 ALJ decision noted that Ms. McCormick was found to have met the listings for 112.02/12.02, 112.04/12.04, and 114.05/12.05.  (Tr. 66.)  The 2018 ALJ decision held that recent evidence demonstrated medical improvement as of September 30, 2015, in that Ms. McCormick no longer had marked or extreme limitations in any of the four areas of mental functioning.  (Tr. 68.)

In so finding, the ALJ noted that June 2015 IQ testing revealed improved scores, with a full-scale IQ score of 82, which was categorized in the low average to borderline range.  (Tr. 67, 70.)  On examination, the consultative examiner noted Ms. McCormick to be well groomed, her speech was relevant and coherent, she was cooperative, her mood was slightly irritable, her affect was depressed, and she showed some impairment in insight and judgment.  (Tr. 69-70.)  Based on the examination findings and IQ testing, the consultative examiner opined that Ms. McCormick could perform tasks related to understanding, remembering, and carrying out instructions commensurate with a person of low average intelligence, could perform simple tasks in a routine fashion, had no more than minor limitations in her ability to conform to social expectations in a work setting, and was below average in her ability to deal with anticipated pressures in a competitive work setting on a full-time basis.  (Tr. 67, 70.)

Ms. McCormick's activities of daily living at that time were described as follows:

> The claimant lives in an apartment with her daughter and no other adults.  She gets up in the morning and gets her daughter ready for school and on to the bus.  While her daughter is at school, she works on arts and crafts or watches television.  She testified that her parents frequently come over in the evening to help the claimant

cook dinner and put her daughter to bed.  However, there is no objective evidence
that she cannot do these things on her own.  The claimant pays bills online and also
uses the internet for social media.  When her daughter is not at school, they go to
the park, Chuck E. Cheese, the library, or the mall.  The claimant reported to a
consultative examiner that she is able to drive independently, prepare simple meals,
complete household chores, and wash laundry.  She also reported that she likes to
garden and occasionally attends church.

(Tr. 69.)  The ALJ also noted that Ms. McCormick received limited treatment for her mental

impairments.  At an assessment in February 2016, she was able to express herself and was easily

understood, reported being independent in self-care, hygiene, and other usual activities of daily

living, and was not at that time prescribed any medication.  (Tr. 70.)  At another assessment

shortly before her 2018 hearing, to establish care with a new provider, she reportedly presented

as alert, fully oriented, neatly dressed, and well groomed, with her mood, affect, psychomotor

activity, memory, speech, attention, and concentration all noted to be within normal limits.  (*Id*.)

The prior ALJ found that Ms. McCormick's severe impairments included borderline

intellectual functioning ("BIF"), learning disorder, attention deficit-hyperactivity disorder

("ADHD"), and depressive disorder.  (Tr. 66-67.)  Based on these impairments and the medical

records, the prior ALJ found Ms. McCormick had the following residual functional capacity:

[T]he claimant has had the residual functional capacity to perform a full range of
work at all exertional levels but with the following nonexertional limitations: The
claimant is limited to simple, routine tasks that do not involve arbitration,
negotiation, confrontation, directing the work of others or being responsible for the
safety or welfare of others.  The claimant cannot perform piece rate work or
assembly line work.  She is limited to only occasional interaction with others.

(Tr. 68.)

## B.    Personal, Educational, and Vocational Evidence

Ms. McCormick was born in 1987, and was 30 years old on the date the present

application was filed, making her a younger individual under Social Security Regulations at all

4

relevant times.  (Tr. 25.)  She had at least a high school education and is able to communicate in English.  (*Id*.)  She has not worked since April 23, 2018, the date of the application.  (Tr. 18.)

## C.     Medical Evidence

Contrary to the Court's initial order, the Commissioner did not include a "Facts" section in its Brief in Opposition, thus failing to identify all records relevant to the Commissioner's legal arguments.  (ECF Doc. 6.)  While the undersigned has undertaken an independent review of the underlying records, particular note was taken of the evidence identified in the underlying ALJ decision and Ms. McCormick's factual summary of the evidentiary record.  *See Eldridge v. Comm'r of Soc. Sec*., 137 F. Supp. 3d 1010, 1017 (S.D. Ohio 2015).

### 1.     Treatment History

On May 22, 2017, Ms. McCormick underwent a psychiatric initial diagnostic evaluation at The Blick Center, seeking services for anxiety and depression.  (Tr. 323.)  She reported living close to family members at all times, who were a support for her when she experienced symptoms and assisted in taking care of her daughter.  (*Id.*)  As to psychiatric treatment, she reported that she was "currently in between medications."  (Tr. 326.)  She reported daily "random thoughts" of suicide, with no plan or intention of self-harm, and hearing "one voice, all the time, every day."  (Tr. 327.)  She described the voice as an internal voice, and said she would sometimes answer it.  (*Id.*)  On examination, her mental status findings were normal except for a "negligible degree of conceptual disorganization" and reported auditory hallucinations.  (Tr. 328.)  Behavioral health and group services were recommended.  (Tr. 328-329.)  It does not appear from the record that Ms. McCormick established care with The Blick Center.

On April 5, 2018, Summa Family Medical Center of Akron completed a telephone encounter with Ms. McCormick after receiving a call from her mother,  (Tr. 397.)  Her mother

reported that she had thrown a fit in a Social Security office after being told her benefits were ending.  (*Id.*)  She was reportedly removed from the building and told she was banned from all Social Security buildings.  (*Id.*)  Her mother reported that she had said she was "going to have to do something desperate" but did not talk of hurting herself or others, and had a tendency to "self medicate."  (*Id.*)

Ms. McCormick was seen the following day by Diana Tec, D.O., at the Family Medicine Center of Akron.  (Tr. 393.)  She reported a past medical history of spinal meningitis as a child, seizures, audio processing disorder, and ADHD, but said she stopped seeing her neurologist when she became pregnant with her 11-year-old daughter, and had been off seizure medications since then.  (Tr. 393-394.)  She and her mother reported she was having absence seizures, although her mother noted it was difficult to tell if she had been having seizures.  (Tr. 393.)  She reported recent loss of her SSI benefits, which was very upsetting since it was her only source of income.  (*Id.*)  This increased stressor reportedly exacerbated her depression, and she admitted drinking a lot more to manage the stress, drinking "6 tall of beer."  (*Id.*)  She reported Zoloft was working well for her prior to the recent situation.  (Tr. 394.)  Dr. Tec diagnosed her with a moderate episode of recurrent major depressive disorder and seizures.  (Tr. 395.)  Dr. Tec recommended increasing her dosage of Zoloft, but Ms. McCormick wished to continue her current dose.  (*Id.*)  She was instructed to follow up with primary care, and given referrals to neurology and psychiatry.  (*Id.*)

On April 9, 2018, Ms. McCormick returned to the Family Medicine Center of Akron and saw Lisa Ditchy, D.O.  (Tr. 389.)  She presented with her mother, complaining of depression and migraines.  (Tr. 390.)  She reported that she thought the Zoloft was working, had no suicidal ideation, and was more grounded, but was still drinking a lot more due to stress.  (*Id.*)  Reported

symptoms included sleep disturbance and being nervous/anxious.  (*Id*.)  Mental status findings were normal on examination, except for mild depression, with no suicidal ideation or plan.  (Tr. 391.)  Ms. McCormick was diagnosed with moderate episode of recurrent major depressive disorder, anxiety and migraine with aura. (*Id*.)  She was advised to continue Zoloft, see behavioral health, and go to Coleman with her mother the next day.  (*Id*.)

On the same day, Ms. McCormick underwent a behavioral health consultation with Brianna Vargo, LSW.  (Tr. 392.)  She reported multiple stressors, including difficulty filling out Social Security paperwork.  (*Id*.)  On examination, she presented with depressed and irritable mood / affect, good eye contact, rapid / pressured / loud speech, difficulty falling asleep, interrupted sleep, suicidal ideation (passive), linear / goal directed / coherent thought processes, and fair insight and judgment.  (*Id*.)

On April 12, 2018, Ms. McCormick saw Dr. Raed Azzam for a neurological consultation, complaining of "episodes of loss of time since age 18 years."  (Tr. 334).  Neurological examination results were normal except for "decreased" attention and memory.  (Tr. 336.)  Ms. McCormick reported "current almost daily prolonged episodes of loss of awareness," with a history of dialeptic seizures and meningitis, having been on anti-epileptic medication until it was stopped during pregnancy at age 18, and with severe depression treated by psychiatry.  (Tr. 337.)  Dr. Azzam's differential diagnosis included "epileptic vs non-epileptic events."  (*Id.*)  He recommended an EEG, brain MRI, and lab work.  (*Id*.)  He noted "[t]he patient does not drive," but advised her and her caregiver that she should not engage in any activities where a seizure would put others in danger, including driving.  (Tr. 338.)

On her attorney's referral, Ms. McCormick underwent cognitive testing with Dr. Collin Myers, Ph.D. PCC-S on April 28, 2018. (Tr. 341.)  Based on his administration of the Wechsler

Adult Intelligence Scale – Fourth Edition (WAIS-IV), Dr. Myers determined her full-scale IQ was 60, which was categorized in the extremely low range of intellectual functioning.  (*Id.*) Other subtest scores included a "borderline" score of 70 in verbal comprehension, and "extremely low range" scores of 67 in perceptual reasoning, 63 in working memory, and 62 in processing speed.  (Tr. 341-343.)  Based on these scores, Dr. Myers opined that Ms. McCormick "may experience great difficulty in keeping up with her peers in a wide variety of situations that require thinking and reasoning abilities."  (Tr. 341-342.)  He noted that she was "very friendly and very cooperative" during the assessment, seemed to be trying her best during all sessions, and "acted very child-like in her interactions with minimal insight."  (Tr. 341, 343.)  He found she presented as having "significant cognitive deficits," and that the assessment appeared to be an accurate measure of her current cognitive status.  (Tr. 343.)  He recommended that she also be assessed for auditory and visual attention deficits.  (*Id.*)

On May 17, 2018 and May 24, 2018, Ms. McCormick completed a Diagnostic Assessment with Kayla Craig of Coleman Professional Services.  (Tr. 518-539.)  She reported living in a home with her parents and daughter, and said she was "very close" with her parents, that they helped her, and that her father cooked for her and got the mail.  (Tr. 518.)  She reported low motivation, depressed mood, anxiety, anger/aggression, and difficulty with attention "all the time," for example forgetting appointments and being unable to multitask.  (Tr. 526.)  She reported having done well on ADHD medication while she was in school.  (*Id.*)  On examination, here mental status results were in the normal range.  (Tr. 529-531.)  She was assessed with Major Depressive Disorder and Generalized Anxiety Disorder.  (Tr. 537.)

Ms. McCormick attended an initial psychiatric evaluation with Dr. Marnie McGrath on June 15, 2018, to establish care for medication management.  (Tr. 540.)  Her mother provided

8

her history, reporting past diagnoses of ADHD, intellectual disability, auditory processing delay and seizures as a child. (*Id*.) Ms. McCormick reported that she was stressed by living by herself, felt overwhelmed caring for her 11-year-old daughter, lacked income, and worried that she would not be able to take her medications and get to doctor's appointments. (*Id*.) She endorsed a depressed mood with associated symptoms of impaired sleep, poor concentration, low motivation, anxiety, and poor executive function. (*Id*.) On examination, Ms. McCormick presented with average and cooperative behavior, normal eye contact, clear speech, euthymic mood, full range of affect, evident developmental delay in her language, logical but concrete thoughts, alert and oriented, with a limited fund of knowledge, and fair insight and judgement. (Tre. 542-543.) Dr. McGrath diagnosed Ms. McCormick with Major Depressive Disorder, Anxiety Disorder, and mild intellectual disability with mild impairments in the conceptual and social domain but moderate impairment in the practical domain. (Tr. 543-544.) She continued Ms. McCormick on amitriptyline and Zoloft, referred her for neuropsychological testing with Dr. Delphi Toth to assess concentration and executive function difficulties, and instructed her to return in three to four weeks for medication management. (Tr. 544.)

Ms. McCormick continued counseling with Ms. Craig, attending appointments on July 25, 2018 (Tr. 552) and August 8, 2018 (Tr. 556). Ms. McCormick reported increased anxiety due to trying new things, loneliness, and worrying about what other people said about her. (Tr. 556). Ms. McCormick reported hearing voices that told her what to do, which were worse when she was off medication or drinking. (Tr. 557.) She also reported eating a lot, staying in her room, and picking skin on her thumb. (Tr. 553, 557-58).

She returned to Dr. McGrath for medication management on July 30, 2018, where she and her mother reported things had been slightly better since she began to take Zoloft regularly

and at the prescribed dose.  (Tr. 546.)  Her depressive symptoms and anxiety had diminished somewhat, and she had less difficulty being in public.  (*Id.*)  Her examination findings were largely unchanged, but with dysphoric mood, developmental delay evident in speech, concrete thoughts, limited fund of knowledge, and fair insight and judgment.  (Tr. 548.)  Her medications were continued and she was again provided contact information for neuropsychological testing with Dr. Toth.  (Tr. 550.)  She was instructed to follow up in three to four weeks for medication management, and an upcoming transfer to a new provider was discussed.  (Tr. 549.)

On August 31, 2018, Ms. McCormick attended another medication management visit with Dr. McGrath.  (Tr. 576.)  Dr. McGrath noted that Ms. McCormick reported being upset because she was having difficulty multitasking, having frequent crying spells, and was stressed about no longer getting disability benefits.  (*Id.*)  On examination, she exhibited a dysphoric and sometimes tearful mood, and continued to present with abnormal language consistent with developmental delay, concrete cognition, and a limited fund of knowledge.  (Tr. 578-579).  Dr. McGrath continued her amitriptyline, increased her Zoloft to 100 mg daily, and advised her to follow up in three to four weeks with Dr. Schepens.  (Tr. 580.)  On this same date, Dr. McGrath also completed the Residual Functional Capacity form discussed in Section II.C.2.ii, *supra*.  (Tr. 560-564.)

Ms. McCormick initiated medication management with Dr. Erik Schepens on October 12, 2018, reporting that she stopped taking her Zoloft two weeks prior with her parents' encouragement because it made her mad.  (Tr. 582.)  Since then, she had not been as mad, but had been crying more and spending most of the time in her room where she felt safe with her toys.  (*Id*.)  Her parents continued to come over during the day to help with food and medicine, and then leave her alone at night.  (*Id*.)  She reported being upset because she was no longer

getting SSDI.  (*Id.*)  On examination, she exhibited dysphoric and sometimes tearful mood, no associations in her thought processes, abnormal language reflecting developmental delays, preoccupation with her Social Security case, concrete cognition, and a limited fund of knowledge.  (Tr. 584-85.)  Dr. Schepens continued her diagnoses, discontinued Zoloft, increased her dosage of amitriptyline, and requested that she return in three weeks with one of her parents. (Tr. 585-586.)

Ms. McCormick underwent a Speech/Language Evaluation with Carolyn Postlethwait, MA, CCC/SLP at Community Speech Services on October 17 and October 24, 2018.  (Tr. 567.) Ms. McCormick's mother provided the history, reporting Ms. McCormick had a difficult time understanding what people were saying, and was diagnosed with auditory processing disorder as a child.  (*Id.*)  On examination, Ms. McCormick was cooperative and pleasant, with adequate speech intelligibility, adequate auditory awareness and listening, attention, localization and figure ground skills, word discrimination with 48% accuracy, auditory memory normal with three items but unable to repeat four item series, auditory closure with 80% accuracy, sounding out words with 60% accuracy, sound blending with 20% accuracy, and comprehension of auditory presented paragraph at 75% accuracy.  (Tr. 568.)  Testing of her cognitive-communicative skills revealed mild deficits in executive functions, language domain, visuospatial skills, and moderate deficits in attention, memory, and clock drawing, with a composite severity in mild deficit range.  (*Id.*)  Her reported reading skills were not good, and she matched words with pictures with 72% accuracy.  (*Id.*)  Her pragmatic language skills were decreased, and her behaviors and interaction appeared much younger than her chronological age. (*Id.*)  In summary, Ms. Postlethwait concluded Ms. McCormick had normal articulation / phonological skills, a mild-moderate disorder in cognition-communication, a moderate disorder

in clock drawing and auditory processing screen, and a moderate severe delay in pragmatic social skills. (Tr. 569.)  She opined that Ms. McCormick would benefit from complete audiological evaluation, including a central auditory processing battery, and deferred making recommendations until this additional testing was complete.  (*Id*.)

Ms. McCormick returned for medication management with Dr. Schepens on November 2, 2018, accompanied by her mother, and reported she was doing "very well" since Elavil was increased at her last visit.  (Tr. 588.)  Her sleep was great, and her anger was all but gone.  (*Id*.) Her mother agreed she had been doing well emotionally over the past month.  (*Id*.)  She was experiencing increased appetite, and had gained weight despite taking daily walks with her daughter.  (*Id*.)  On examination, she had a "good" / euthymic mood but continued to exhibit abnormal language related to developmental delay, no associations in her thought processes, preoccupation with food, concrete cognition, and a limited fund of knowledge. (Tr. 590-591.) Dr. Schepens continued her medications and advised her to return in four weeks.  (Tr. 591.)

On December 11, 2018, Dr. Delphi M. Toth, Ph.D. provided a letter summarizing his findings from a neuropsychological and psychological evaluation of Ms. McCormick, based on evaluation sessions conducted between August and November of 2018.  (Tr. 571-573.)  It does not appear that any of the underlying examination findings or test results were made a part of the medical records in this case.  Based on the testing conducted by Dr. Toth – which is generally described rather than specifically identified by Dr. Toth, and the results of which are not included in the record – Dr. Toth described Ms. McCormick as "having an IQ in the Mentally Retarded Range" and noted that her "[p]ersonality testing showed both affective and psychotic components, indicating a diagnosis of Schizoaffective Disorder" which was "reinforced by her description of the voices she hears in her head telling her to do bad things."  (Tr. 572-573

12

(emphasis removed).)  Further findings and opinions of Dr. Toth relating to this evaluation are set forth in Section II.C.2.i., *supra.*

Ms. McCormick returned to Dr. Schepens for medication management on December 21, 2018, reporting she was trying to lose weight and eat healthier, was sleeping well, had energy during the day, and felt her mood was "good," but noting that her mother wanted her to mention that she continued to have problems with concentration and daydreaming often.  (Tr. 593.)  She was seeing her counselor every other week.  (*Id*.)  She denied hearing voices, stating the last time she heard voices was over the summer after accidentally drinking alcohol she thought was juice. (*Id.*)  Her examination results were unchanged.  (Tr. 595-596.)  Dr. Schepens diagnosed major depressive disorder in remission, chronic intellectual disability, and ADHD, and made a note to rule out schizoaffective disorder, depressive type, in light of her history of hearing voices.  (Tr. 596.)  He continued her Amitriptyline and instructed her to return in ten weeks.  (Tr. 596-597.)

On January 12, 2019, Ms. McCormick was brought to the Summa Health Emergency Department by EMS, who she called seeking help for suicidal ideation and hearing voices that were telling her to hurt herself.  (Tr. 671.)  Upon arrival, she denied suicidal ideation and said she only said she was suicidal to get EMS to come get her.  (*Id.*)  She also indicated "she was hallucinating before but denie[d] seeing or hearing anything," and clarified that she "does not actually listen to the voices."  (*Id.*)  The emergency department physician noted that she initially presented as "a bit frustrated and nervous" (Tr. 672), and was "initially appropriate and cooperative but then easily bec[ame] agitated" (Tr. 674).  She did not want to stay in the hospital and tried to escape while her doctor was treating other patients, fought staff who tried to restrain her, and was eventually sedated with Haldol, Ativan, and Benadryl, placed in four leather restraints, and subjected to video monitoring.  (Tr. 676.)  The doctor observed she "seemed to be

having a panic attack" as she was extremely agitated and breath holding.  (*Id.*)  Mental status examination results from the following day reflected an irritable mood, anxious affect, limited insight, and poor judgment.  (Tr. 690.)  She was discharged to her mother on January 13, 2019, and her mother promised to ensure she kept an appointment with her psychiatrist the following day.  (Tr. 692.)

She saw Dr. Schepens for an acute visit on January 14, 2019, reporting that she had gone to the emergency room because she was feeling overwhelmed, and had been feeling stressed and overwhelmed since January when her insurance lapsed and she forgot to reapply.  (Tr. 598.)  She reported feeling overwhelmed by the paperwork involved, and had missed appointments and run out of medication.  (*Id.*)  On Saturday, she reported feeling overwhelmed and hearing voices telling her to harm herself.  (*Id.*)  She reported hearing voices for years, but this was the first time they were mean and told her to hurt herself.  (*Id.*)  Since her visit to the ER, she reported continuing to hear voices, but said they were not telling her to do anything, and said "I don't listen to them."  (*Id.*)  Her mother reported that she had been overwhelmed and upset for two weeks due to the insurance and paperwork, but told Dr. Schepens she did not think Ms. McCormick was a danger to herself, and that she would watch her closely.  (*Id.*)  On examination, Ms. McCormick appeared anxious and distressed, had abnormal language consistent with developmental delay, exhibited no associations in her thought process, was preoccupied with paperwork, reported hearing voices telling her to hurt herself over the weekend, but had no intent or plan for self-harm, and exhibited concrete cognition and limited fund of knowledge.  (Tr. 600-601.)  Dr. Schepens added a diagnosis of "schizoaffective, depressive type," noting she was stressed and tearful, and endorsed hearing worsening voices

that she had heard for years.  (Tr. 601.)  He continued her Amitriptyline and added Risperdal for hallucinations.  (*Id.*)

Ms. McCormick returned to Dr. Schepens for medication management on February 1, 2019 (Tr. 604), and March 1, 2019 (Tr. 610).  At both appointments, Ms. McCormick reported being stressed regarding insurance and SSI, and continuing to hear voices telling her to drink alcohol, saying "you are stressed," and saying "mean things" like "nobody is going to help you" and the "medications aren't helping."  (Tr. 604, 610.)  She also reported the Risperdal was making her sleepy.  (Tr. 604.)  Examination results noted a "stressed" mood, abnormal language consistent with a language delay, exhibited no associations in her thought process, preoccupations with paperwork and her mother's work schedule, reported auditory hallucinations, and a limited fund of knowledge. (Tr. 606-607, 612-613.)  At the first appointment, Dr. Schepens indicated she had chronic voices that she was currently unable to block out, which were "[m]ost likely exacerbated due to worry about SSI." (Tr. 607.)  At the second appointment, Dr. Schepens noted continued low mood with ongoing auditory hallucinations that were demeaning, and increased her dosage of Risperdal.  (Tr. 613.)

Ms. McCormick returned to Dr. Schepens on April 5, 2019, reporting her mood was a lot better.  (Tr. 616.)  Although she was still hearing "mean" voices, they were not bothering her recently and she was doing her best to ignore them.  (*Id.*)  She reported no stress regarding paperwork, and being excited about plans to go on vacation in Myrtle Beach in the summer. (*Id.*)  On examination, she demonstrated a euthymic / restricted affect, abnormal language consistent with developmental delay, no associations in her thought processes, preoccupation with going on vacation, continuing to hear voices that were not bothersome, concrete cognition, and a limited fund of knowledge. (Tr. 618-620).  Dr. Schepens diagnosed schizoaffective

disorder, depressive type, with improving mood and continued auditory hallucinations that had become less bothersome, chronic intellectual disability, and ADHD.  (Tr. 620-621.)  He continued her medications and made a note to rule out alcohol use disorder.  (Tr. 621.)

On April 17, 2019, Ms. McCormick had a counselling session with Ms. Craig.  (Tr. 637.) She reported she had been helping her dad with gardening.  (*Id*.)  Mental status results were in the normal range.  (Tr. 637-638.)  She was anxious about beginning classes with Project Learn, and Ms. Craig educated her about organization.  (Tr. 638-639.)

On May 17, 2019, Ms. McCormick returned to Dr. Schepens for medication management.  (Tr. 624.)  She reported a "good" mood, with improved anxiety.  (*Id*.)  She reported restarting Concerta with her primary care provider, and noticed her focus and ability to complete tasks had gotten better.  (*Id*.)  She continued to complain of auditory hallucinations, with voices telling her to "break stuff" and "hurt yourself," but reported they were not as bad with Risperidone, that she blocked them out as much as possible, and that she had not acted on them.  (*Id*.)  On examination, she demonstrated a "good" / euthymic mood, with a full range and congruent affect, logical thought processes, normal language, preoccupation with getting back on Concerta, and otherwise normal findings.  (Tr. 626.)  Her diagnoses and medications remained the same, and Dr. Schepens discussed a concern with case management that Ms. McCormick was using alcohol.  (Tr. 628-629.)

On August 13, 2019, Ms. McCormick had a counselling session with Ms. Craig.  (Tr. 649.)  She reported "doing okay," but "worrying about finances and social security."  (*Id*.) Mental status results were in the normal range.  (Tr. 649-650.)  She had another counselling session with Ms. Craig on August 30, 2019.  (Tr. 653.)  She reported "feeling about the same,"

and dealing with stress due to the fact she was relying on her family financially, and she knew "money is stretched." (*Id.*)  Mental status results remained in the normal range. (Tr. 653-654.)

Ms. McCormick returned to Coleman Professional Services for medication management on September 13, 2019, four months after her last visit with Dr. Schepens. (Tr. 631.)  She was seen as a "first time transfer" by Dr. Michael McFadden. (*Id.*)  She reported her mood was "okay" overall, but she was having problems with sleep, irritability, and anxiety about being in public around other people. (*Id.*)  She continued to report auditory hallucinations, stating that the voices were "mean" and command in nature, directing her to hurt herself. (*Id.*)  However, she reported the voices were quieter than they had been, so she ignored them. (*Id.*)  She noted that the voices were worse when she drank alcohol. (*Id.*)  She reported medication compliance, and that her medications helped her with anxiety and auditory hallucinations. (*Id.*)  She reported spending time with her daughter, and continuing to receive help from her parents, stating that they regularly helped her to prepare meals and take care of the home. (*Id.*)  On examination, Ms. McCormick presented as "slightly childlike in tone," with an "okay" / anxious mood, a full range and congruent affect, logical but concrete thoughts, preoccupations, being "fixated on 'mean people' in public," normal orientation, unremarkable cognition, and fair insight and judgment (Tr. 633-634.)  Dr. McFadden diagnosed schizoaffective disorder, depressive type, chronic, stable, with continued auditory hallucinations that were managed with medications, chronic intellectual disability, worsening anxiety NOS, and chronic stable ADHD. (Tr. 635.)  He continued her Risperdal and increased her dosage of amitriptyline. (Tr. 635.)

Summit Department of Disabilities provided a report spanning the period from February 15, 2019 to February 14, 2020, which included a summary by Ms. McCormick of her day-to-day activities. (Tr. 713, 720-731.) In the summary, Ms. McCormick indicated that mother dropped

her dad off at her house before 7:00am to assist with waking her up and ensuring her daughter got to school.  (Tr. 720.)  She could dress and use the bathroom independently, but her daughter assisted with her hygiene by reminding her to apply deodorant and brush her teeth, her dad cut her nails, and she did not shave in order to avoid cutting herself.  (*Id.*)  Her dad made breakfast for her and her daughter because she did not use the stove.  (*Id.*)  Her dad returned around 1:00 p.m. to fix her lunch, and both parents came over to make her dinner.  (Tr. 721.)  Her parents prepared all her meals because she had burnt herself in the past, and had gotten distracted while cooking and left the stove unattended, causing a fire hazard.  (*Id.*)  She could prepare food in the microwave.  (*Id.*)  On Sundays, her mom filled a pill minder so she could take her morning and evening medications every day. (Tr. 722.)  She relied on her parents to remind her to take her medications twice daily, and her mother got her medication refills.  (*Id.*)  Her mother also made her lists of household chores that needed to be done to help her remember what to do.  (Tr. 723.)  Her mother cleaned the bathroom for her because in the past she mixed chemicals and almost fainted.  (Tr. 724.)  Her mother sometimes took her to do her laundry, and added the detergent and bleach because Ms. McCormick once spilled bleach on her clothes and ruined them.  (*Id.*)  When Ms. McCormick was too anxious to leave the house, her mother would do the laundry for her.  (*Id.*)  Her parents also did most of her grocery shopping, because she found it overwhelming to go to the store, and sometimes forgot the PIN number for her Food Stamp card.  (Tr. 728.)  When she did her own grocery shopping, she used lists made by her parents.  (*Id.*)

### 2. Opinion Evidence

#### i. Neuropsychological Evaluation

On December 11, 2018, Dr. Delphi Toth completed a neuropsychological and psychological evaluation of Ms. McCormick at the request of primary care provider Dr. Andrea

Lee.  (Tr. 571.)  He explained that his findings were "based on diagnostic interviews with the patient and her mother, and on the results of a flexible battery of cognitive and personality tests," noting that some parts of the testing were read to her and some of her responses were written for her.  (Tr. 572.)  As noted previously, the record does not appear to contain the interview notes, objective examination findings, or formal test results on which Dr. Toth based his opinions. Nevertheless, his notes reflect that Ms. McCormick presented as awake and cooperative, "incompletely oriented" to person, place and time, "severely impaired" in her ability to focus and maintain concentration, "highly distractible," demonstrated mild expressive anomia (word-finding difficulty) and some articulation problems, asked Dr. Toth repeatedly to say things again, showed mild deficits in discerning and identifying visual patterns, with more difficulty as the patterns became increasingly complex, and showed "several frontal lobe signs, including perseveration and emotional lability."  (Tr. 572.)  Dr. Toth noted that objective and projective personality testing showed indications of formal thought disorder, and that her personality tests and interview responses were suggestive of schizoaffective disorder.  (Tr. 572-573.)  He noted that her "current IQ" of 69 "place[d] her in the Retarded Range," but did not identify the testing that identified this IQ or provide the relevant test results.  (Tr. 575.)

Based on his evaluation, Dr. Toth concluded that Ms. McCormick suffered from severe problems with attention and resisting distraction, leading to poor memory and recall, and her intelligence and other cognitive functions, including language, visual-perceptual, and frontal lobe functions, were "all in the upper end of the Retarded Range."  (Tr. 572.)  Dr. Toth opined that Ms. McCormick's cognitive functions were consistent with her history of meningitis at a young age, with all cognitive functions depressed uniformly.  (*Id*.)  He noted that because she had lessened frontal lobe function, her judgement and emotional control would be impaired even if

19

she did not have ADHD, and the stimulant medications used to treat ADHD "may not be beneficial in her case." (*Id*.)  He noted that personality testing showed both affective and psychotic components, indicating a diagnosis of Schizoaffective Disorder, with testing results reinforcing her description of voices that she hears telling her to do bad things. (Tr. 573.)  Dr. Toth noted these auditory hallucinations and command hallucinations are characteristic of psychosis. (*Id*.)  He opined that Ms. McCormick had "multiple problems that make consistent employment unrealistic," including cognitive impairments (frontal lobe impairment, inability to read, learning and memory difficulties, high levels of distractibility and emotional volatility), as well as depression, anxiety, psychotic thinking and auditory hallucinations. (*Id*.)

> ## ii.  Opinions of Plaintiff's Medical Providers

On August 31, 2018, after treating Ms. McCormick for "2.5 months," psychiatrist Dr. Marnie McGrath completed a check-box Mental Residual Functional Capacity form regarding Ms. McCormick's mental health limitations and restrictions. (Tr. 560-564.)  Dr. McGrath opined that Ms. McCormick was limited to: work with routine changes; simple, routine, and repetitive tasks; no strict production quotas; low stress work with no confrontation, arbitration, negotiation, strict time limits, supervision of others, ability to influence others, or responsibility for the health, safety or welfare of others; no traveling, driving, or delivery for work; no more than occasional interaction with co-workers and supervisors; superficial contact with the public; would require weekly reminders to properly perform work tasks; and would have issues responding appropriately to regular/normal work criticism. (Tr. 560).  She also opined that Ms. McCormick met Listings 12.04 and 12.06, checking the boxes for every functional category without indicating whether the limitations were marked or extreme. (Tr. 561-562.)  Dr. McGrath concluded that Ms. McCormick's subjective complaints were consistent with her diagnosis, and

that due to her limitations and restrictions she would be off-task more than fifteen percent (15%) of the time at work and would miss two (2) or more days of work per month. (Tr. 564.)  She further opined that these limitations were lifelong, and that Ms. McCormick would require assistance managing any benefits awarded.  (*Id*.)

On June 26, 2018, primary care provider Dr. Andrea Lee completed an Abilities and Limitations for Self-Sufficiency regarding Ms. McCormick's work abilities for the Department of Job and Family Services.  (Tr. 441.)  The form is hand-written and difficult to decipher, although it appears to reference functional limitations relating to stress and cognitive delay.  (*Id.*) Dr. Lee also checked boxes indicating that Ms. McCormick is unable to remember work locations/procedures, maintain attention/concentration, sustain an ordinary routine, carry out instructions, perform activities with a schedule and interact with the general public. (*Id*.)  She opined that these limitations would last 12 months or more.  (*Id*.)

On October 16, 2019, psychiatrist Dr. Michael McFadden completed an Abilities & Limitations for Self- Sufficiency regarding Ms. McCormick's work abilities for the Department of Job and Family Services.  (Tr. 752.)  Dr. McFadden deferred to Ms. McCormick's primary care provider as to functional limitations, but checked boxes indicating that Ms. McCormick was unable to remember work locations/procedures, maintain attention/concentration, sustain an ordinary routine, carry out instructions, perform activities with a schedule and interact with the general public.  (Tr. 752.)  He further noted that she had completed neuropsychiatric testing stating she was "unable to work in any capacity."  (*Id*.)

### iii.      Opinions of State Agency Reviewers

#### a.      State Agency Medical Reviewers

On July 11, 2018, state agency reviewing physician Steve McKee, M.D. reviewed the record and identified new and material evidence requiring amendment of the prior physical residual functional capacity assessment.  (Tr. 90.)  Dr. McKee opined that Ms. McCormick was limited to never climbing ladders, ropes, or scaffolds, and must avoid all exposure to hazards such as unprotected heights, dangerous machinery, or commercial driving due to her seizure disorder.  (Tr. 89-91.)

On November 14, 2018, state agency reviewing physician Mehr Siddiqui, M.D., reviewed the record and largely concurred with the earlier opinion of Dr. McKee, but found additional exertional limitations including: medium exertional limitations with occasionally lifting or carrying 50 pounds, frequently lifting or carrying 25 pounds, and standing, walking, or sitting up to six hours in an eight-hour work day; and limitation to frequent overhead reaching with the left upper extremity.  (Tr. 109-111.)

#### b.      State Agency Psychological Reviewers

On July 11, 2018, state agency reviewing psychologist Patricia Kirwin, Ph.D., reviewed the record and opined that Ms. McCormick had moderate impairment in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and Adapt or manage herself.  (Tr. 86-87.)  She adopted the Mental RFC assessment of the ALJ in the 2018 prior ALJ decision, which concluded Ms. McCormick was:

> limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety or welfare of others.  [Ms. McCormick] cannot perform piece rate work or assembly line work.  She is limited to only occasional interaction with others.

(Tr. 91.)  In making this finding, Dr. Kirwin made the following observations:

22

There is an inconsistency in Clmt's IQ test scores comparing 2015 to 2018.  YCE [psychiatric consultative examination] FSIQ [full-scale IQ] 82 falls in high range of BIF [borderline intellectual function].  A score on an IQ test can be an underestimate but never an overestimate.  Clmt's score in this instance is High in BIF.

The scores on WAIS-IV given at 4/28/18 Y [psychiatric] evaluation were VCI 70 PRI 67 WMI 63 PSI 62 FSIQ 60.  The Clmt's FSIQ score in this instance falls in the range of Mild Intellectual Disability.

<u>Since a score on an IQ test can be an underestimate but never an overestimate, there is no reported significant intervening head trauma that would account for such a large loss of cognitive ability in 3 years</u> as the Neuro OV only noted a memory decrease and this is unknown if this is when compared to general population or clmts' past scores; Neuro commended on the epilepsy and found other parts of MSE WNL; <u>the scores obtained at the 4/28/18 eval are considered to be far underestimates of clmt's abilities and the dx [diagnosis] that gives of intellectual disability will be considered as invalid as those test results.</u>

(Tr. 87 (emphasis added).)

On December 18, 2018, state agency reviewing psychologist Carl Tishler, Ph.D., reviewed the record and concurred with the opinion of Dr. Kirwin, finding that the medical records submitted by Ms. McCormick on reconsideration did not substantially change the prior assessment.  (Tr. 105-107, 112.)

D.     **Hearing Testimony**

1.     **Ms. McCormick's Testimony**

At the November 19, 2019 hearing, Ms. McCormick testified that she lived in Akron with her daughter, who was twelve.  (Tr. 37-38.)  She had full custody of her daughter, although she split up care with her mother.  (Tr. 38.)  She had been in her current home two or three years. (*Id*.)  She had a driver's license, but had not driven in about a year.  (Tr. 42.)  She reported that her Mom was sick the last time she drove, and that she drove to a store about a block away.  (Tr. 42-43.)  Normally, she went to the store with her cousin or her Dad.  (Tr. 43.)  Her Mom paid her

bills because she did not know how.  (*Id*.)  She reported she had never worked, except for a brief period when she was 18.  (Tr. 39.)

On a normal day, Ms. McCormick reported that her parents came over in the morning.  (Tr. 40.)  Her Mom got her daughter ready and dropped her off at school.  (*Id*.)  Her Dad came to wake her up around 10:00 a.m.  (Tr. 40.)  He would cook her breakfast; she could not touch the stove because she would forget it was on and will burn things.  (Tr. 39.)  After breakfast, her Dad would give her a book to draw or color in, and then she would take a nap until he woke her up for lunch.  (*Id*.)  Her parents got her daughter to school and took her to doctor's appointments.  (Tr. 39-40.)  She got food stamps, but her Dad took her shopping because he said she bought nothing but junk food.  (Tr. 40.)  She had a pet fish, but her Dad took care of it because she would forget to feed it.  (Tr. 40-41.)  Her Mom called and reminded her about personal care tasks like brushing her teeth.  (Tr. 41.)  Her Mom also left post-it notes around the house with reminders of what to do, and left her a one or two item "to do" list with chores like sweeping and vacuuming.  (*Id*.)  After work, her Mom came back and washed the dishes and did other chores like cleaning the bathroom.  (*Id*.)  Her daughter did laundry, mopped, and cooked sometimes.  (Tr. 42.)  If her parents were not there, she needed extra help from the Summit Department of Disabilities to help prepare her meals, read her mail, and help her with bathing because she would get nervous and forget things.  (*Id*.)

Her cousin Leila helped her clean, and her aunties visited her at home.  (Tr. 45-46.)  Sometimes she went outside to garden with her Dad, but she spent a lot of time in her room.  (Tr. 46.)  She planned a vacation to Myrtle Beach over the summer, but was not able to afford the trip.  (Tr. 46.)  She had a phone but not a computer.  (Tr. 44.)  Sometimes her brother let her go

online using his computer, and she liked to look at dancing cats on YouTube. (*Id*.) She did not know how to turn on a computer or operate it. (Tr. 45.)

She took medications for blood pressure, depression, ADHD, schizophrenia, and to help her sleep. (Tr. 38-39.) She experienced no side effects, except that she sometimes could not sleep at night. (Tr. 39.) She heard voices all the time, but they were no longer as loud after she started taking medication and stopped drinking. (Tr. 44.)

Ms. McCormick's mother, Kimberly McCormick, testified that she saw her daughter daily and helped her with her mail, appointments, laundry, cleaning, and food preparation. (Tr. 47.) She also reported that Ms. McCormick received support from an assistant known as an "SSA" from the Summit County Board of Disabilities to help her organize, make sure she took her medication, and help with food prep, laundry, and cleaning. (Tr. 47-48.) She reported that she and her husband were less able to provide help since Ms. McCormick's father had a stroke and her mother had to take on a third job. (Tr. 48.)

Ms. McCormick's mother reported that she could not take her daughter on vacations lasting more than two or three days because she would get upset, irritated and violent. (Tr. 49.) She also reported that Ms. McCormick got upset and became threatening at a visit to the Social Security office and three times at Jobs and Family Services. (Tr. 49-50.) She thought this was because her daughter could not understand what they wanted her to do. (Tr. 51.)

She also reported that Ms. McCormick got accommodations when she took her driver's test. (Tr. 52.) A tutor from the Summit Country Department of Disabilities worked to prepare her for about six months, and the computer read everything to her when she took the test. (*Id*.)

## 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 55.)  For his first hypothetical, the ALJ asked the VE to assume an individual of Ms. McCormick's age and education and with her past work, with the following functional limitations:

> consider a younger individual born in 1987 with a high school education under the regulations [who] can lift, carry, push and pull 20 pounds occasionally and 10 frequently, can sit for six hours, stand and/or walk for six hours in a normal work day.  This person cannot climb ladders, ropes or scaffolds.  This person can frequently reach overhead bilaterally.  This person must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.  This person cannot perform any commercial driving.  There are further limitations to simple, routine tasks that do not involve arbitration, negotiation or confrontation. This person cannot direct the work of others and cannot be responsible for the safety or welfare of others.  This person cannot perform piece rate work or assembly line work for this hypothetical interaction is limited to occasional interaction with others.

(Tr. 56.)  The VE testified that the hypothetical individual could perform representative positions in the national economy, including housekeeper, cafeteria attendant, and price marker.  (Tr. 57.)

Next, the ALJ amended the hypothetical by adding the limitation that the individual would require frequent redirection from a supervisor in order to stay on task, and this redirection would continue for the length of the employment.  (*Id*.)  The VE testified that this would be "supportive employment which is, by definition, contrary to competitive employment."  (*Id*.)

Finally, the ALJ amended the first hypothetical by adding the limitation that, because of distractibility and volatility, the hypothetical individual could not interact whatsoever with the public and could only occasionally interact with supervisors.  (Tr. 58.)  The VE testified that this would qualify as "a job in isolation," and there are no unskilled job that are performed in isolation.  (*Id*.)

In response to questions from Ms. McCormick's counsel, the VE also testified that a person can be absent no more than one day a month, and off-task on average no more than ten

26

percent of a workday, to maintain competitive employment.  (Tr. 59.)  While there was no

vocational metric for social relations in the DOT, the VE believed that there would be minimal

tolerance for an individual who "had issues responding to normal work criticism," for example

by crying or panicking.  (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations.  The five steps can be summarized as

follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must
    be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a
    severe impairment that has lasted or is expected to last for a continuous
    period of at least twelve months, and his impairment meets or equals a listed
    impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his December 5, 2019 decision, the ALJ noted his obligation under *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6) to follow the RFC finding of the prior ALJ in March 19, 2018, absent specified circumstances. (Tr. 15.) Based on that authority, the ALJ held that he was bound to adopt the mental RFC of the prior ALJ because "there is no new and material evidence as it relates to the mental health treatment." (*Id.*) However, he held that the evidence of physical impairments showed new and material changes, such that he was not bound to adopt the physical RFC of the prior ALJ decision. (*Id.*)

The ALJ then made the following findings:[2]

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, citations to the DIB and SSI regulations regarding disability determinations will usually be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

1.      The claimant has not engaged in substantial gainful activity since April 11, 2018, the application date.  (Tr. 18.)

2.      The claimant has the following severe impairments: borderline intellectual functioning, learning disorder, attention deficit hyperactivity disorder, depression, and obesity.  (*Id*.)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)

4.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she cannot climb ladders, ropes or scaffolds. She can frequently reach overhead bilaterally. She should avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. She is limited to no commercial driving. She is limited to simple routine tasks that do not involve arbitration, negotiation or confrontation. She cannot direct the work of others or be responsible for the safety or welfare of others. She is limited to no piece rate work or assembly line work. She can have occasional interaction with others.  (Tr. 20.)

5.      The claimant has no past relevant work.  (Tr. 25.)

6.      The claimant was born in 1987 and was 30 years old, defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

7.      The claimant has at least a high school education and is able to communicate in English.  (*Id*.)

8.      Transferability of job skills is not an issue because the claimant has no past relevant work.  (*Id*.)

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including housekeeper, cafeteria attendant, and price marker.  (Tr. 25-26.)

Based on the foregoing, the ALJ determined that Ms. McCormick had not been under a disability, as defined in the Social Security Act, from April 11, 2018, through the date of the decision on December 5, 2019.  (Tr. 26.)

## V. Ms. McCormick's Arguments

In her brief, Ms. McCormick raises the following legal issues:

1. Did the ALJ err at Step 2 by failing to consider Ms. McCormick's diagnosis and medical impairment of schizo-affective disorder/schizophrenia as a severe impairment?

2. Did the ALJ err at Step 3 by not finding that Ms. McCormick met Listings 12.04, 12.06 or 12.11?

3. Did the ALJ err by finding the opinions by State Agency consultants, Patricia Kirwin, Ph.D., and Carl Tishler, Ph.D., persuasive?

4. Did the ALJ err by finding the opinions of Dr. Marnie McGrath and Dr. Delphi Toth not persuasive?

5. Did the ALJ err by assigning Ms. McCormick a Residual Functional Capacity (RFC) that is not supported by substantial evidence?

(ECF. Doc. 15 p. 1.)

## VI. Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."); *see*

*also Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 752 (N.D. Ohio 2020) ("Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.") (citing *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2009)). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Erred in Failing to Find Schizoaffective Disorder was a Severe Impairment and/or Failing to Consider the Effects of Schizoaffective Disorder on the RFC**

Ms. McCormick asserts that the ALJ erred at Step Two of his analysis when he failed to identify schizoaffective disorder as a severe impairment. (ECF Doc. 15 p. 11.) She argues that the medical records establish this diagnosis was made, and that she repeatedly presented with related symptoms at her medical appointments. (*Id.* (citing records).) She further argues that the ALJ failed to consider the combined effects of all of her impairments because he did not address whether her schizoaffective disorder was severe or non-severe, and did not specify whether it caused limiting effects. (*Id.* at pp. 11-12.)

As an initial matter, there is no question in this case that the ALJ failed to identify schizoaffective disorder as a medically determinable impairment, neither identifying it as severe nor as non-severe. (Tr. 18.) The Commissioner does not dispute that schizoaffective disorder is a "medically determinable impairment" in this case, as evidenced by records demonstrating that the impairment was diagnosed by an acceptable medical source (Tr. 572-573, 601, 635) and substantiated by objective medical evidence (Tr. 600-601, 606-607, 612-613, 618-620, 633-635, 671-676). *See Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017) (noting a medically determinable impairment is "an impairment that results

32

from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques") (citing 20 C.F.R. §§ 404.1505, 404.1508, 404.1520(a)(4)(ii) and 404.1527(a)(1)), *report and recommendation adopted sub nom. Jones v. Berryhill*, 2017 WL 1196179 (S.D. Ohio Mar. 31, 2017).

Instead, the Commissioner argues that a diagnosis of schizoaffective disorder alone does not establish that the impairment was severe.  (ECF Doc. 17 p. 4.)  She also argues that the ALJ considered Ms. McCormick's schizoaffective disorder diagnosis and symptoms in his decision, and that any error in failing to designate it as a severe impairment was therefore harmless.  (*Id.* at p. 5.)  Finally, she argues that Ms. McCormick has not demonstrated that her schizoaffective disorder would have required greater limitations than those accounted for in the RFC.  (*Id.*)

A claimant bears the burden of showing the severity of her impairments at Step Two of the sequential analysis.  *Foster v. Sec'y of Health & Human Svcs.*, 899 F.2d 1221 (table), 1990 WL 41835, *2 (6th Cir. 1990) (citing *Murphy v. Sec'y of Health & Human Svcs.,* 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007) (citing 20 C.F.R. § 416.920); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).  The ability to do basic work activities, means having "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering

simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." *Id*.

Step two is a "*de minimis* hurdle ... intended to screen out totally groundless claims." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (internal quotations and citations omitted). Thus, "if an impairment has more than a minimal effect on the claimant's ability to do basic work activity, the ALJ must treat it as severe." *Id.*; *see* Titles II & XVI: *Med. Impairments That Are Not Severe*, SSR 85-28 (S.S.A. 1985) ("not severe" finding is appropriate when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work…"). Although the standard is *de minimis*, it is recognized that a diagnosis alone "says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

Where an ALJ has identified both severe and non-severe impairments, the Sixth Circuit has held that a decision finding some impairments non-severe was harmless error when the Commissioner could still consider the non-severe impairments in assessing the RFC. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (finding it "legally irrelevant" that some impairments were not deemed severe where the designation of other impairments as severe "cleared step two of the analysis" and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ

characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

A similar standard has been applied to find harmless error when an ALJ failed to designate specified impairments as medically determinable (i.e., finding them neither severe nor non-severe), but still found other impairments severe at Step Two. *See, e.g., Hatton v. Comm'r of Soc. Sec.,* No. 16-14463, 2018 WL 1278916, at *6 (E.D. Mich. Feb. 14, 2018) (holding ALJ's finding that two impairments were not medically determinable was harmless error regardless of whether they met the *de minimus* standard for severity when "the ALJ deemed other impairments severe, proceeded through the sequential disability analysis, and nevertheless considered symptoms associated with these conditions in fashioning the RFC"), *report and recommendation adopted sub nom. Hatton v. Berryhill,* 2018 WL 1254948 (E.D. Mich. Mar. 12, 2018); *Soto v. Comm'r of Soc. Sec.,* No. 17-10054, 2018 WL 2181098, at *7 (E.D. Mich. Mar. 2, 2018) (holding any error in failure to consider diagnoses of ADHD, depression, and personality disorder as medically determinable or severe was "harmless error because there are no functional limitations in the record as a result of those conditions, beyond those assessed, to be included in the RFC"), *report and recommendation adopted,* 2018 WL 1466087 (E.D. Mich. Mar. 26, 2018); *Rouse v. Comm'r of Soc. Sec.,* No. 2:16-CV-0223, 2017 WL 163384, at *5 (S.D. Ohio Jan. 17, 2017) (finding "the error made by the ALJ is harmless" where the ALJ was not clear as to which impairments were non-severe and which were not medically determinable, but claimant identified no limitations arising from the impairments "and it [wa]s not apparent that any exist"), *report and recommendation adopted,* 2017 WL 1102684 (S.D. Ohio Mar. 24, 2017).

However, courts have found the harmless error standard was not applicable where an ALJ failed to consider the relevant impairments in assessing the RFC. *See Simpson v. Comm'r of Soc.*

35

*Sec.*, 344 F. App'x 181, 190-91 (6th Cir. 2009) (finding reversible error when ALJ found

nonsevere mental impairments "would not be considered in assessing her RFC"); *Miller v.*

*Kijakazi*, No. 2:20-CV-013, 2021 WL 3494563, at *6 (E.D. Tenn. Aug. 9, 2021) (finding failure

by ALJ to discuss Plaintiff's vision impairments at Step Two or in the RFC determination "was

not harmless because she did not consider these impairments in the RFC determination"); *Dudley*

*v. Comm'r of Soc. Sec.*, No. 2:16-CV-0682, 2017 WL 2374432, *4 (S.D. Ohio June 1, 2017)

(finding harmless error did not apply to finding mental impairments nonsevere when ALJ "did

not take any mental impairments or limitations into account" in the RFC), *report and*

*recommendation adopted*, 2017 WL 2645962 (S.D. Ohio June 20, 2017); *Rose v. Comm'r of Soc.*

*Sec.*, No. 2:14-CV-1901, 2015 WL 6735313, *5 (S.D. Ohio Nov. 4, 2015) (finding harmless

error analysis "is appropriate only when the ALJ properly considered any functional limitations

arising from non-severe impairments when crafting his residual functional capacity finding"),

*report and recommendation adopted*, 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015); *Pompa*, 73 F.

App'x at 803 (applying harmless error standard where "ALJ considered all of [Ms.

McCormick]'s impairments in her residual functional capacity assessment finding"); *Hatton,*

2018 WL 1278916, at *6 (finding harmless error when impairments were found not medically

determinable but the ALJ "nevertheless considered symptoms associated with these conditions in

fashioning the RFC").

  Here, it is evident from the plain language of the decision that the ALJ considered Ms.

McCormick's schizoaffective disorder diagnosis and symptoms in assessing the RFC.  In

particular, the ALJ observed in his Step Four analysis that Dr. Toth diagnosed Ms. McCormick

with schizoaffective disorder, auditory hallucinations, and command hallucinations (Tr. 22

(citing Tr. 571-574)), that she described having heard voices for years in January 2019 treatment

records (Tr. 22 (citing Tr. 598)), that she was hospitalized for suicidal ideation and hallucinations

in January 2019 but denied initial complaints of hallucinations (Tr. 22 (citing Tr. 671)), that she

continued to report hallucinations in March 2019 and took medications including Risperidone

(Tr. 22 (citing Tr. 612-614)), and that she reported hearing voices that were "not bothersome"

and continued to endorse hallucinations through late 2019 (Tr. 23 (citing Tr. 617-618)).  In

support of his findings regarding the persuasiveness of the state agency psychological consultant

opinions, the ALJ characterized Ms. McCormick's mental health treatment records as

"show[ing] generally stable findings with some vague suicidal ideation and reports of

hallucinations which were not supported by objective findings and also refuted on one occasion."

(Tr. 23 (citing Tr. 598, 617-618, 671).)  The record thus reflects that Ms. McCormick's

schizoaffective disorder and related symptoms were considered by the ALJ in assessing the RFC.

While it is evident that the ALJ did consider Ms. McCormick's schizoaffective disorder

and related symptoms in assessing the RFC, it is also evident that he did not add any limitations

to the RFC specifically relating to this impairment.  This fact is made clear by the ALJ's

conclusion under *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997) and Acquiescence

Ruling 98-4(6) that "[e]ven viewing the evidence in the light most favorable to the claimant,

there is no new and material evidence as is relates to mental health treatment," such that he was

"bound to adopt the residual functional capacity found by the ALJ who adjudicated the prior

decision as it pertains to the mental health treatment records." (Tr. 15.)  The prior ALJ decision

did not consider any evidence relating to schizoaffective disorder. (Tr. 65-72.)  This

determination is consistent with the ALJ's explanation of the basis for his determination of the

mental RFC, which makes no mention of hallucinations or schizoaffective disorder:

> With regard to the claimant's mental impairments, the claimant's activities of daily
> living included living alone with a daughter, shopping in stores, attending church,

driving, and going on vacation (C4E and testimony). The claimant's mental health treatment records generally showed moderate findings with regard to mood, memory, orientation, and affect. However, while the claimant has been diagnosed with various cognitive impairments, IQ testing was noted by some acceptable medical sources as being an underestimation (C5F/1, 69; C14F/2 and C4A). In light of her activities of daily living and comments made during treatment, the claimant's limitations remained unchanged from the prior decision.

(Tr. 24-25.)

In cases such as this, where the ALJ <u>has</u> considered an impairment in assessing the RFC <u>but</u> found no related functional limitations, "[t]he question then becomes whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence" *Rose*, 2015 WL 6735313, at *5; *see also Simpson*, 344 F. App'x at 190-191 (finding ALJ lacked substantial evidence to find plaintiff had no mental limitations after relying on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 787–88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support no mental limitations after mischaracterizing evidence and misstating the treating doctor's findings); *Rouse*, 2017 WL 163384, at *5 (finding "the error made by the ALJ is harmless" where claimant identified no limitations arising from the impairments "and it [wa]s not apparent that any exist") *Owens v. Comm'r of Soc. Sec.*, No. 1:14-CV-554, 2015 WL 2084703, at *4 & n.7 (S.D. Ohio May 4, 2015) (finding ALJ committed reversible error when substantial evidence did not support finding that impairment was non-severe and ALJ failed to include related limitations in RFC); *Biehl v. Comm'r of Soc. Sec.*, No. 14-10293, 2015 WL 736366, at *21 (E.D. Mich. Feb. 20, 2015) ("[B]ecause it is at best unclear whether the ALJ considered plaintiff's mental impairment in determining her RFC, the court cannot conclude that the ALJ's finding is supported by substantial evidence.").

38

As noted above, "[s]ubstantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030.  In considering this standard, it must also be considered whether the reasoning given fails to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Because the ALJ failed to designate schizoaffective disorder as severe or non-severe and failed to specify whether it caused limiting effects, Ms. McCormick argues that the ALJ failed to "build an accurate and logical bridge," and that the decision is not supported by substantial evidence.  (ECF Doc. 15 p. 12.)

Where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, it has repeatedly been held that the ALJ failed to build an accurate and logical bridge between the evidence and the result.  *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

Here, while the ALJ did evidently consider Ms. McCormick's schizoaffective disorder in assessing the RFC, the record does not support a finding that he built an accurate and logical bridge between the evidence and his determination not to apply any functional limitations

relating to that impairment.  As discussed below, the undersigned finds that there are several record references in the decision that misstate or mischaracterize the evidence in a way that precludes a finding that the decision was supported by substantial evidence.

For example, when the ALJ discussed Ms. McCormick's complaints of auditory hallucinations that resulted in hospitalization in January 2019, he observed "[i]nterestingly, the claimant stated that she had heard voices for years, despite no note in previous treatment records."  (Tr. 22 (citing Tr. 598).)  This observation is factually incorrect.  The record reflects that Ms. McCormick reported as early as May 2017 that she heard an internal voice "all the time, every day," and would sometimes answer it.  (Tr. 327.)  These reports were noted at the administrative level of review.  (Tr. 84.)  The records also indicate that she complained to her counselor in August 2018 about hearing voices that told her what to do since she was 18 years old, which were worse when drinking or when she was off her psychiatric medications, and which were "mean" and made it hard for her to concentrate.  (Tr. 557.)  Dr. Toth's neuropsychological examination findings also reflect that she made specific complaints of voices in her head telling her to do bad things during evaluations conducted between August and November of 2018.  (Tr. 571-573.)  The ALJ's observation that Ms. McCormick did not make complaints to providers about hearing voices before January 2019 was not accurate, and reflects a misapprehension regarding her treatment history that may have influenced the ALJ's decision not to adopt RFC limitations relating to Ms. McCormick's schizoaffective disorder.

In another instance, the ALJ observed that Ms. McCormick "denied initial complaints of suicidal ideation and hallucinations" during her January 2019 hospitalization, and concluded that her medical records showed "generally stable findings with some vague suicidal ideation and reports of hallucinations which were also not supported by objective findings and also refuted on

one occasion." (Tr. 22 (citing Tr. 671), 23 (citing Tr. 598, 617-618, 671).)  In fact, the records

from that hospitalization do not reflect that Ms. McCormick denied having hallucinations.  The

records indicate instead that Ms. McCormick agreed "she was hallucinating before," but then

denied "seeing or hearing anything" by the time she reached the hospital.  (Tr. 671.)  They

further indicate that she did not deny her prior statement to police that "she was hearing voices

that were telling her to hurt herself," but instead told emergency room providers that "she does

not actually listen to the voices."  (*Id.*)  A denial of current hallucinations and an assertion that

she does not listen to the voices she hears is very different from an outright denial that she had

heard voices at all.  It is further observed that these denials appear to have been offered when

Ms. McCormick realized she was not free to leave the hospital.  (*Id.*)  The medical records also

demonstrate that the treating physician did not credit her denials, and did not discharge her,

instead involuntarily sedating and physically restraining her.  (Tr. 676, 686.)  It is thus apparent

that the ALJ's statements that Ms. McCormick "denied" or "refuted" her complaints of auditory

hallucinations were not accurate, and reflected another apparent misapprehension regarding her

treatment history that may have influenced the ALJ's decision not to adopt RFC limitations

relating to Ms. McCormick's schizoaffective disorder.

The ALJ also observed that Ms. McCormick had "no noted hallucinations" during a

September 2019 psychiatric examination (Tr. 23 (citing Tr. 632-633)), but this is again not a

fully accurate characterization of the relevant records.  While the mental status examination

findings by Dr. McFadden do not have the "hallucinations" box checked (Tr. 633), the office

notes nevertheless reflect that Ms. McCormick continued to endorse auditory hallucinations that

were "mean" and "command in nature directing her to hurt herself," but that they were quieter so

that she was able to ignore them (Tr. 631).  The records for this treatment visit continue to reflect

a diagnosis of schizoaffective disorder, depressive type, which was noted at this visit to be chronic and stable, with auditory hallucinations managed with medications. (Tr. 635.)

Finally, it is noted that the ALJ's characterization of Ms. McCormick's schizoaffective disorder symptoms as "a period of reported hallucinations in late-2019" (Tr. 19) and "some vague suicidal ideation and reports of hallucinations which were also not supported by objective findings" in the context of "generally stable findings" (Tr. 23) are not wholly consistent with the evidentiary record. Instead, the records reflect historical complaints of hearing voices in 2017 and 2018, worsening during a period of stress in January 2019 when her insurance coverage lapsed and she went off of her psychiatric medications, and ultimately stabilizing (but not going away) with antipsychotic medication. The descriptions she gave of her hallucinations were not vague, but included specific characterizations of the tone and message of the voices. (*See, e.g.,* Tr. 604, 610, 616, 631.) And while the records do not contain mental status findings noting Ms. McCormick to be internally stimulated, findings did regularly reflect speech abnormalities, preoccupation, concrete thoughts, and a limited fund of knowledge. (Tr. 542-543, 548, 578-579, 584-585, 590-591, 595-596, 600-601, 606-607, 612-613, 618-620.) Viewing the record as a whole, the undersigned does not find the ALJ's characterization of Ms. McCormick's mental health treatment history as "generally stable" which "a period of reported hallucinations" and/or "vague suicidal ideation and reports of hallucinations which were also not supported by objective findings" to be an accurate characterization of the medical records relating to Ms. McCormick's diagnosis of schizoaffective disorder.

Because the ALJ did not acknowledge Ms. McCormick's schizoaffective disorder to be a medically determinable impairment – severe or nonsevere – and relied on mischaracterizations of the medical records in support of an RFC that did not incorporate functional limitations arising

from this condition, the Court cannot conclude that the ALJ's failure to classify schizoaffective disorder as a severe impairment at Step Two was harmless error.  Accordingly, the undersigned recommends that this case be remanded to allow the ALJ the opportunity to address the impact of Ms. McCormick's schizoaffective disorder on her mental RFC.

**C.     Second Assignment of Error: Whether ALJ Erred in Finding Ms. McCormick Did Not Meet Listings 12.04, 12.06 and/or 12.11**

Ms. McCormick also asserts that the ALJ erred at Step Three of the sequential analysis by finding that she did not meet or medically equal Listings 12.04, 12.06, and/or 12.11, the listings pertaining to depressive, bipolar and related disorders (12.04), anxiety and obsessive-compulsive disorders (12.06), and neurodevelopmental disorders (12.11).  (ECF Doc. 15 pp. 12-13 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F2).)  In particular, she asserts that the ALJ erred in finding that she had only moderate limitations in three specific areas of mental functioning: understanding, remembering, or applying information; concentrating, persisting, and maintaining pace; and adapting or managing herself.  (*Id.* at pp. 13-15.)  The Commissioner responds that the ALJ appropriately applied the evidence to the regulatory standards and reasonably determined that Ms. McCormick had no more than moderate limitations in each of the four areas of mental functioning.  (ECF Doc. 17 pp. 6-7.)

At Step Three, a claimant will be found disabled if her impairment meets or medically equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a).

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.927(c)(3).  A claimant must satisfy all the criteria to "meet" the listing.  *See* 20 C.F.R. §§ 404.1525(c)(3) and (d), 416.925(c)(3) and (d); *Hale v. Sec'y of Health & Human Servs*., 816 F.2d 1078, 1083 (6th Cir. 1984).  At Step Three, the ALJ must evaluate the evidence, compare it to the section of the Listing at issue, and "give an explained conclusion, in order to facilitate meaningful judicial review." *Johnson v. Saul*, No. 1:18-CV-00175-HBB, 2019 WL 5902168, at *5 (W.D. Ky. Nov. 12, 2019) (quoting *Reynolds v. Comm'r Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). Without this explanation, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Reynolds*, 424 F. App'x at 416.

To satisfy Listings 12.04 and 12.06, a claimant must demonstrate the paragraph "A" and "B" criteria or the paragraph "A" and "C" criteria.  20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.  To satisfy Listing 12.11, a claimant must demonstrate the paragraph "A" and "B" criteria. *Id*.  Ms. McCormick focuses her argument on the same three "B" criteria findings for all of the listings at issue, arguing the ALJ "did not dispute the fact that Plaintiff met the 'paragraph A' criteria" in each.  (ECF Doc. 15 p. 13.)  While the Commissioner explains that the ALJ was not required to address the "A" criteria after determining Ms. McCormick did not meet the "B" criteria, she does not offer any argument to support a finding that the "A" criteria were not met in this case.  (ECF Doc. 17 pp. 6-7, n. 3.)  Accordingly, this analysis will focus on whether the ALJ erred in his findings regarding the three "B" criteria categories challenged by Ms. McCormick.

### 1.    Understanding, Remembering, or Applying Information

The ALJ determined that Ms. McCormick had moderate limitations in understanding, remembering, or applying information, explaining:

> In understanding, remembering or applying information, the claimant has a
> moderate limitation. The claimant underwent IQ testing as part of an evaluation
> (C5F/1, 69 and C14F/2). She has been diagnosed with an intellectual development
> disorder (C5F/3 and C11F/27). However, State Agency consultants noted that the
> claimant's testing results were not an accurate reflection of her functioning (C4A).
> Regardless, her activities of daily living include raising a daughter, vacuuming,
> planting flowers, and shopping in stores (C4E). She testified that she drives and
> lives alone with her daughter (testimony). The mental status examination findings
> showed rare findings of limitations in memory (C14F). However, findings
> generally showed unremarkable memory. Therefore, the claimant has moderate
> limitation in understanding, remembering, or applying information.

(Tr. 18.)  Ms. McCormick argues that the ALJ's finding of no more than moderate limitations
was in error because "the testing that the ALJ cites is in fact reliable" and the test findings are
"also supported by the record."  (ECF Doc. 15 p. 13.)

As the standard is substantial evidence, the questions are whether the ALJ's finding that
Ms. McCormick had moderate limitations in understanding, remembering, and applying
information was supported by "such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion," *Besaw*, 966 F.2d at 1030, and whether the ALJ's related
analysis "buil[t] an accurate and logical bridge between the evidence and the result," *Fleischer*,
774 F. Supp. 2d at 877.  As with the analysis for the first assignment of error, the answer to this
question must be no.

As a preliminary matter, it is acknowledged that some evidence summarized and relied
upon in the 2018 prior ALJ decision may prompt significant concerns as to the veracity and/or
reliability of the cognitive testing and subjective allegations offered by Ms. McCormick in
support of this application.  That decision describes a consultative examination in June 2015 with
largely normal mental status findings and cognitive testing results placing Ms. McCormick in the
low average to borderline range of intelligence, with a full-scale IQ of 82.  (Tr. 67, 69-70.)
Other records relied upon in that decision also reflect largely normal mental status examination

findings despite limited to no mental health treatment.  (Tr. 70.)   Self-reported activities detailed

in the decision included living alone with her daughter, getting her daughter ready for school in

the morning and onto the bus, paying bills online, using social media, driving independently,

preparing simple meals, completing household chores, and washing laundry.  (Tr. 69.)

These specific concerns were highlighted by the state agency psychological examiners

when they noted the inconsistency between the 2015 FSIQ score of 82 (low average to

borderline) and the 2018 FSIQ score of 60 (mild intellectual disability), and concluded that the

2018 FSIQ score was a "far underestimate[] of [Ms. McCormick]'s abilities" because "a score on

an IQ test can be an underestimate but never an overestimate" and there was "no reported

significant intervening head trauma that would account for such a large loss of cognitive ability."

(Tr. 87, 106.)  It also does not escape the notice of the undersigned that the 22-point decrease in

Ms. McCormick's full-scale IQ score was measured within one month of the ALJ decision that

ended Ms. McCormick's prior entitlement to social security disability benefits. (Tr. 341-343.)

All of that being said, the present record contains more than a single 2018 cognitive test

result in support of limitations in Ms. McCormick's ability to understand, remember, and apply

information.  In addition to two cognitive test results of uncertain reliability (*see* Tr. 341-343

(4/28/18 Dr. Myers WAIS-IV test results, FSIQ 60), Tr. 571-573 (12/11/18 Dr. Toth letter

stating "current IQ 69" without identifying test or attaching test results)), the record also reflects

objective examination findings that include "acted very childlike in her interactions with minimal

insight" (Tr. 343), abnormal language on examination consistent with developmental delay, as

well as concrete thoughts and limited fund of knowledge (Tr. 542-543, 548, 578-579, 584-585,

590-591, 595-596, 600-601, 606-607, 612-613, 618-620), decreased pragmatic language skills

with behaviors and interactions appearing much younger than her chronological age, with a

moderate severe delay in pragmatic social skills (Tr. 568), "incompletely oriented" to person, place, and time, "severely impaired" in focus and concentration, with word finding difficulties, articulation problems, perseveration, and emotional lability (Tr. 572), and "slightly childlike in tone" with logical but concrete thoughts (Tr. 633-634).

While the ALJ accurately describes many of the above medical findings in the decision (Tr. 21-24), his explanation for continuing to find no more than moderate limitations in this category is limited to the state agency consultants' conclusions that new IQ testing was unreliable, the limited mental status findings regarding memory limitations, and Ms. McCormick's reported activities of daily living.  (Tr. 18, 24-25.)  The ALJ did not compare the findings in the 2015 consultative examination with the 2018 evaluations and/or testing, and did not explicitly find the 2015 cognitive test results more reliable.  Indeed, the 2015 consultative examination report was not even made a part of the present evidentiary record.  The ALJ also offered no clear explanation for his finding that the symptomatic objective findings discussed above, in the context of ongoing mental health treatment with psychiatric medications, counseling, and emergent care, represented no "new and material" change from the largely normal mental status findings and lack of treatment outlined in the 2018 prior ALJ decision.  To the extent that the 2018 cognitive test results submitted by Ms. McCormick were considered unreliable and the 2015 results too remote, the ALJ did not order a new psychiatric consultative examination to provide updated or more reliable findings.

It is further noted that the ALJ's recitation of activities of daily living performed by Ms. McCormick appears to misrepresent – at least through omission – what activities she truly reported being able to perform.  For example, the ALJ noted "[s]he testified that she drives and lives alone with her daughter" (Tr. 18) without acknowledging her further testimony detailing

significant daily assistance from her parents with performing her self-care activities, caring for

her daughter, preparing meals, taking care of household chores, and shopping, as well as her

testimony that she does not drive and last drove a year before to a store down the street (Tr. 39-

43).  The ALJ also noted that her function report described raising a daughter, vacuuming,

planting flowers, and shopping in stores (Tr. 18) without acknowledging that she described

shopping "not often" with her mother there to sure she got the right change, needing help from

her parents with money (including counting change), needing encouragement to vacuum or plant

flowers, and having help from her parents in caring for her daughter (Tr. 221-224).

While the ALJ in this case was not required to credit Ms. McCormick's subjective reports

of limitation, particularly given the potential conflicts between the significant limitations that

were reported in the present record and the inconsistent reports of greater activity levels and

independence described in the 2018 prior ALJ decision, the fact remains that the ALJ did not

base his findings on an explicit comparison between past reported activities and present reported

limitations.  Instead, he provided descriptions of Ms. McCormick's current self-reported

activities that were not consistent with the contents of the evidence cited by the ALJ.  Where an

ALJ "mischaracterizes [a claimant's] testimony regarding the scope of her daily activities," and

"fail[s] to note or comment upon the fact that [the claimant] receives assistance for many

everyday activities" from family who live close by, the Sixth Circuit has held that the resulting

credibility determination may not be supported by substantial evidence.  *Rogers v. Comm'r of

Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

Because the ALJ's explanation for finding that Ms. McCormick had no more than

moderate limitations in understanding, remembering, and applying information provided too

little information regarding his reasoning to build "an accurate and logical bridge" between the

evidence and the result, and was based in part on a mischaracterization of the evidence relating
to Ms. McCormick's daily activities, the undersigned concludes that this finding was not
supported by substantial evidence and recommends that the matter be remanded so that the ALJ
can assess the relevant evidence and provide a clear explanation for his findings regarding Ms.
McCormick's level of limitation in this area of mental functioning.

### 2. Concentrating, Persisting, or Maintaining Pace

The ALJ determined that Ms. McCormick had moderate limitations in concentrating,
persisting, or maintaining pace, explaining:

> With regard to concentrating, persisting or maintaining pace, the claimant has a
> moderate limitation. The claimant stated that she could watch television, perform
> yard work, and had no issues with personal care.  However, she stated that she
> needed some reminders and encouragement to complete tasks (C4E). During
> treatment, she was oriented to person, place and time and was able to complete
> mental health tasks with apparent good effort (C14F).  Therefore, the claimant has
> a moderate limitation with regard to concentrating, persisting, or maintaining pace.

(Tr. 19.)

Ms. McCormick appropriately notes that the ALJ's citation to Exhibit C14F in support of
a finding of moderate limitations in this category "does not makes sense."  (ECF Doc. 15 p. 14.)
That exhibit is a letter from Dr. Toth outlining the findings from his neuropsychological and
psychological evaluation of Ms. McCormick in 2018.  (Tr. 571-573.)  Although the letter is a
summary of Dr. Toth's findings, rather than a copy of his examination notes, it describes
objective findings on examination that included "incompletely oriented" to person, place, and
time, "severely impaired" in focus and concentration, "highly distractible," asking the examiner
repeatedly to say things again, showing mild deficits with visual patterns and more difficulty as
patterns became increasingly complex, and "frontal lobe signs" that included perseveration and

49

emotional lability.  (Tr. 572.)  Ms. McCormick's psychiatrists also repeatedly noted preoccupations in her mental status examinations.  (Tr. 585, 590, 595, 600, 606, 618-620, 626.)

Because the ALJ's explanation for finding that Ms. McCormick had no more than moderate limitations in concentrating, persisting, and maintaining pace relied upon internally inconsistent information, it was insufficient to build "an accurate and logical bridge" between the evidence and the result.  The undersigned accordingly concludes that the finding was not supported by substantial evidence and recommends that the matter be remanded so that the ALJ can assess the relevant evidence and provide a clear explanation for his findings regarding Ms. McCormick's level of limitation in this area of mental functioning.

### 3.    Adapt or Manage Oneself

The last paragraph "B" determination that Ms. McCormick challenges relates to her ability to adapt or manage herself.  The ALJ again determined that Ms. McCormick had moderate limitation in this domain, explaining:

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant underwent IQ testing as part of an evaluation (C5F/1, 69 and C14F/2). She has been diagnosed with an intellectual development disorder (C5F/3 and C11F/27). However, State Agency consultants noted that the claimant's testing results were not an accurate reflection of her functioning (C4A). Regardless, her activities of daily living include raising a daughter, vacuuming, planting flowers, and shopping in stores (C4E). She testified that she drives and lives alone with her daughter (testimony). The mental status examination findings showed rare findings of limitations in memory (C14F). However, findings generally showed unremarkable memory. The claimant stated that she lived with her daughter. She stated that she spent time with family, could use public transportation, shop in stores, and attend church (B4E). The record showed some reports of outbursts (C10F/66-67). However, the claimant was able to interact with others and go on vacation (C15F/43-44 and testimony). The record showed some variable mood with a period of reported hallucinations in late 2019 (C16F/10-11). Therefore, based upon her cognitive limitations, poor frustration tolerance and issues with personal interaction, she has experienced a moderate limitation in adapting or managing oneself.

(Tr. 19.)

The reasoning offered by the ALJ in support of this finding is problematic for numerous reasons that were previously articulated herein.  To the extent the finding is based on Ms. McCormick's cognitive limitations, the undersigned outlined the ALJ's failure to provide sufficient information concerning his assessment of these limitations in Section VI.C.1., *infra*. To the extent the finding is based on reported activities that include raising a daughter, shopping in stores, living alone, and driving, the undersigned explained how these descriptions mischaracterized the evidence cited by the ALJ in Section VI.C.1., *infra*.  To the extent the finding is based on Ms. McCormick's "variable mood with a period or reported hallucinations in late 2019," the undersigned described the mischaracterizations of evidence that undermine the ALJ's assessment of Ms. McCormick's schizoaffective disorder in Section VI.B., *infra*.

Because the ALJ's explanation for finding that Ms. McCormick had no more than moderate limitations in adapting and managing oneself provided unclear information regarding his reasoning and was based in part on mischaracterized evidence, the undersigned concludes that the ALJ failed to build "an accurate and logical bridge" between the evidence and the result, and that this finding was accordingly not supported by substantial evidence.  The undersigned therefore recommends that the matter be remanded so that the ALJ can assess the relevant evidence and provide a clear explanation for his findings regarding Ms. McCormick's level of limitation in this area of mental functioning.

For the reasons stated above, the undersigned recommends that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for his findings as to the paragraph "B" criteria discussed herein, and reassess his findings as to whether Ms. McCormick's impairments meet Listings 12.04, 12.06, and/or 12.11 in light of that analysis.

**D.     Third and Fourth Assignments of Error: Whether ALJ Erred in Evaluating Medical Opinion Evidence**

Ms. McCormick argues in her third assignment of error that the ALJ erred in finding the opinions by State Agency reviewing psychologists Dr. Kirwin, and Dr. Tishler persuasive.  (ECF Doc. 15 pp. 17-19.)  Conversely, she argues in her fourth assignment of error that the ALJ erred in finding the opinions of examining psychiatrist Dr. McGrath and examining psychologist Dr. Toth unpersuasive.  (*Id.*at pp. 19-21.)  These assertions are closely linked, as all relate to the ALJ's application of the revised regulations for the evaluation of opinion evidence set forth in 20 C.F.R. § 404.1520c, and all are based on the allegation that the ALJ cherry-picked record evidence in support of a finding of disability.

Because Ms. McCormick's claim was filed after March 27, 2017, it must be evaluated under revised regulations which require the ALJ to evaluate opinion evidence primarily based on the opinion's consistency with other evidence in the record and supportability.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).  The categories of evidence to be considered under these new regulations include: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings.  20 C.F.R. § 416.913(a)(1)-(5).

The regulations specify that SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 416.920c(a). Distinct from a prior framework that gave more weight to opinions from treating sources, the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by using the five factors listed in paragraphs (c)(1) through (c)(5) of the

regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, *2 (N.D. Ohio Apr. 8, 2020) (*quoting Gower v. Saul*, No. 4:19-CV-00058, 2020 WL 1151069, *4 (W.D. Ky, March 9, 2020) (*citing* 20 C.F.R. § 404.1520c(a) and (b)).

The five factors are supportability, consistency, relationship with claimant, specialization, and other factors, but supportability and consistency are acknowledged to be the most important factors for consideration.  20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2).  The regulations define "supportability" as: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  The regulations define "consistency" as: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

While ALJs are expected to explain how consistency and supportability were considered, they "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."  20 C.F.R. § 416.920c(b)(2).  Ultimately it is the ALJ, not any medical provider, who is responsible for determining the claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).

### 1.    Whether ALJ Erred in Finding State Agency Opinions Persuasive

The ALJ addressed the opinions of State Agency reviewing psychologists Dr. Kirwin and

Dr. Tischler together, as they reached identical conclusions.  The ALJ explained:

> On July 11, 2018, State Agency consultant Patricia Kirwin, Ph.D., reviewed the
> claimant's medical record and opined that the claimant had moderate limitation in
> understanding, remembering, or applying information, moderate limitation in
> interacting with others, moderate limitation in concentration, persistence, or
> maintaining pace, and moderate limitation in adapting or managing oneself. She
> adopted the residual functional capacity of the prior Administrative Law Judge
> (C2A). On December 18, 2018, State Agency consultant Carl Tishler, Ph.D.,
> reviewed the claimant's medical record and agreed with the earlier opinion of Dr.
> Kirwin (C4A). The opinions of the State Agency psychological consultants are
> persuasive. They are acceptable medical sources who reviewed the claimant's
> medical record. Further, their opinions are consistent with the mental health
> treatment records, which showed generally stable findings with some vague
> suicidal ideation and reports of hallucinations which were also not supported by
> objective findings and also refuted on one occasion (C15F/24, 43-44 and C17F/8).

(Tr. 23 (emphasis added).)  The undersigned previously explained in Section VI.B., *infra*, that

the ALJ mischaracterized the mental health treatment records when he described them as

showing "generally stable findings with some vague suicidal ideation and reports of

hallucinations which were also not supported by objective findings and also refuted on one

occasion."  For the same reasons set forth in that prior analysis, the undersigned concludes that

the ALJ's findings regarding the state agency psychological consultants' medical opinions are

not supported by substantial evidence.

The undersigned accordingly recommends that the case be remanded so that the ALJ may

provide a full and accurate explanation of the evidence and reasoning that forms the basis for his

determination as to whether the opinions of the state agency psychiatric consultants are

supported by and/or consistent with the medical record evidence.

## 2.      Whether ALJ Erred in Finding Dr. McGrath Opinion Unpersuasive

Ms. McCormick also challenges the ALJ's treatment of the opinion of her treating

psychiatrist, Dr. McGrath.  (ECF Doc. 15 pp. 19-20.)  The ALJ discussed the opinion as follows:

> Marnie McGrath, M.D., completed an opinion form on August 31, 2018, where she
> stated that the claimant was limited to routine changes, simple, routine and
> repetitive tasks, no strict production quotas and low stress work. She said the
> claimant could not have work involving arbitration, confrontation, negotiation,
> strict time limits for completing of tasks, responsibility for the health safety or
> welfare of others, supervision of others, ability to influence others, or to travel,
> drive or deliver for work. She said the claimant could have only superficial contact
> with the public and occasional interaction with coworkers and supervisors. She said
> the claimant would require extra reminders or assistance to properly perform work
> weekly and weekly issues responding appropriately to regular or normal work
> criticism. She indicated marked or extreme limitations in the B criteria and meeting
> the paragraph C criteria for listing 12.04 and 12.06. Finally, she said the claimant
> would be absent from work twice a month and of task greater than fifteen percent
> of the workday (C12F). <u>The opinion of Dr. McGrath is not persuasive. While she
> is an acceptable medical sources [sic] her opinion was overly restrictive in light of
> the treatment records and suggests much greater limitations than is supported by
> the record or the claimant's activities of daily living.</u>

(Tr. 24 (emphasis added).)

In discussing the persuasiveness of this opinion, the ALJ broadly addressed the issues of

supportability (finding the limitations overly restrictive in light of "treatment records" that

presumably included Ms. McCormick's three treatment visits with Dr. McGrath) and consistency

(finding the limitations are greater than is supported by "the record or the claimant's activities of

daily living").  *See* 20 C.F.R. § 416.920c(c)(1)-(2).  However, because the undersigned has

already determined that the ALJ relied on mischaracterizations of the evidence concerning Ms.

McCormick's schizoaffective disorder, failed to adequately explain his discounting of evidence

relating to her cognitive impairment, and inaccurately described her self-reported activities of

daily living, the undersigned cannot find that these broadly stated reasons for finding Dr.

McGrath's opinion "not persuasive" are supported by substantial evidence.

The undersigned accordingly recommends that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for his determination as to whether the opinion of Dr. McGrath is supported by and/or consistent with the medical record evidence.

### 3.    Whether ALJ Erred in Finding Dr. Toth Opinion Unpersuasive

Ms. McCormick also challenges the ALJ's evaluation of the opinion of examining neuropsychiatrist Dr. Toth, arguing that the ALJ erred in finding that opinion not persuasive based on the factors of consistency and supportability in 20 C.F.R. § 416.920c(b)(2).  (ECF Doc. 15 p. 20-21.)  The ALJ first discussed Dr. Toth's evaluation in his analysis of the medical evidence, and later addressed the persuasiveness of his related opinions, as follows:

> The claimant underwent a neuropsychological evaluation on December 11, 2018. The claimant's mother stated that the claimant became angry when she does not understand people including acting out. Examination showed incomplete orientation to person, place, and time. The claimant had an IQ of 69, which Delphi Toth, Ph.D., wrote put her in the "retarded range" of intelligence. She was noted to have severe problems in immediate and short-term memory with spotty recall during remote memory testing. She was also diagnosed with schizoaffective disorder, auditory hallucinations, command hallucinations, depression, anxiety and attention deficit hyperactivity disorder. Dr. Toth noted that the claimant had been unable to work in even a sheltered setting, and noted that she had problems with focus, problem-solving initiating and discontinuing, maintain control of emotions, learning and retaining, and highly distractible and emotional volatility (C14F).
>
> ****
>
> On December 11, 2018, psychologist Delphi M. Toth, Ph.D., examined the claimant and opined that consistent employment was unrealistic. She said the claimant could not read and had difficulty learning and retaining. She said that the claimant was highly distractible and emotionally volatile (C14F). The opinion of Dr. Toth is not persuasive. <u>Her opinion is not consistent with the record as a whole including the treating records and testimony which indicated that the claimant lived along [sic] with her daughter and performed household chores and shopping</u> (C4E and testimony).

(Tr. 22, 24 (emphasis added).)

For the same reasons discussed with respect to Dr. McGrath's opinion, the undersigned cannot conclude that the ALJ's general findings regarding the persuasiveness of Dr. Toth's opinion were supported by substantial evidence in this case, given the inaccuracies in the ALJ's discussion of the medical records and Ms. McCormick's self-reported activities of daily living.

The undersigned accordingly recommends that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for his determination as to whether the opinion of Dr. Toth is supported by and/or consistent with the medical record evidence.

**E.      Fifth Assignment of Error:  Whether RFC is Supported by Substantial Evidence**

Ms. McCormick's last assignment of error largely restates the same issues previously addressed in this case.  She asserts that the ALJ erred by making an RFC determination that was not supported by substantial evidence.  (ECF Doc. 15 pp. 21-22.)  The Commissioner responds that the decision made by the ALJ was supported by substantial evidence, and fell within the "zone of choice" the provides ALJs discretion to make findings that are supported by the records without interference from reviewing courts.  (ECF Doc. 17 p. 16.)

As the undersigned has concluded that the ALJ's findings in the case were undermined by mischaracterizations of the evidence and a failure to adequately explain the discounting of certain evidence, the undersigned likewise finds that the RFC in this case was not supported by substantial evidence, as the ALJ failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

For all of the reasons set forth herein, the undersigned recommends that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for the RFC adopted in this case.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should ensure that his analysis regarding Ms. McCormick's schizoaffective disorder, cognitive impairments, and activities of daily living accurately describe the underlying evidence and clearly set forth the ALJ's reasoning in making each of the determinations required under Steps Two, Three, and Four of the sequential analysis.


*/s/Amanda M. Knapp*

January 27, 2022
_____
AMANDA M. KNAPP
United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).